**VITALITY REHAB, INC.**

v.

**Kathleen SEBELIUS.**

**No. CV 08–4575–VBF(SHx).**

United States District Court, C.D. California.

Aug. 3, 2009.

---

Nick Migliaccio, for Plaintiffs.

Indira J. Cameron–Banks, Asst. U.S. Attorney, Jonathan C. Brumer, U.S. Dept. of Health and Human Services, Washington, DC, for Defendants.

**PROCEEDINGS: HEARING ON APPEAL OF SECRETARY'S MAY 15, 2008 FINAL ADMINISTRATIVE DECISION (doc. # 19)**

VALERIE BAKER FAIRBANK, District Judge.

Rita Sanchez, Courtroom Deputy.

Rosalyn Adams, Court Reporter.

Case called, and counsel make their appearance.

The Court presents its tentative ruling (doc. # 23), and hears oral arguments from counsel. The Court takes the matter under submission.

Later, upon further review of the Parties' papers and the Parties' oral arguments, the Court finds that the tentative ruling is the order of the Court.

**PROCEEDINGS (IN CHAMBERS): TENTATIVE RULING ON APPEAL OF SECRETARY'S MAY 15, 2008 FINAL ADMINISTRATIVE DECISION (doc. # 19)**

**I.  Tentative Ruling**

On July 14, 2008, Plaintiff Vitality Rehab., Inc. ("Vitality") filed a complaint challenging the May 15, 2008 final administrative decision of Defendant Secretary of Health and Human Services ("Secretary"). In that decision, the Secretary denied Vitality's claims for reimbursement of bad debts for the fiscal year of 1999. These bad debts were unpaid deductibles and coinsurance amounts related to outpatient therapy services that Vitality provided to Medicare eligible patients who were dually eligible for Medicare and Medicaid in the fiscal year of 1999.

On April 14, 2009, Vitality filed its Opening Brief (doc. # 19). On May 15, 2008, the Secretary filed her Opening Brief (doc. # 20). On June 11, 2009, Vitality filed a Consolidated Opposition to the Secretary's Opening Brief and Reply Brief (doc. # 21).[1] On July 15, 2009, the Secretary filed her Reply (doc. # 22).

---

1. Vitality asserts that the Secretary was required to file an Opposition as well as an Opening Brief pursuant to the Court's January 12, 2009 Scheduling Conference Order. Vitality requests that because the Secretary failed to file a separate opposition, that Vitality's Opening Brief is uncontested and the Court's decision should be rendered in its favor. Vitality also objects to the filing of the Secretary's Reply. *See* Vitality Opp. and Reply at 2:13–3:6, n. 1. The Court does not grant Vitality's request. *See* Secretary Reply at 2 n. 3. The Parties followed the Court's briefing schedule set forth in the January 12, 2009 Scheduling Conference Order (doc. # 17), with the Secretary's Final Reply due on July

The Court upholds the Secretary's May 15, 2008 final administrative decision. The Secretary's final administrative decision is reasonable, supported by substantial evidence, and consistent with the Medicare statute and regulations. Further, in giving the Secretary's interpretation of regulations due deference, as set forth below, there is a reasonable basis for the Secretary's decision denying Vitality's claims for reimbursement of bad debts.

The case's original caption is *Vitality Rehab, Inc., a California Corporation v. Michael O. Leavitt, Secretary, United States Department of Health and Human Services.* Pursuant to Federal Rule of Civil Procedure 25(d), Kathleen Sebelius, the current Secretary of Health and Human Services, is substituted for Michael O. Leavitt, the former Secretary.

## II. Background

### A. Statutory and Regulatory Background

The Medicare Act, established by Title XVIII of the Social Security Act, creates a federal health insurance program that provides benefits to eligible elderly and disabled individuals. *See* 42 U.S.C. § 1395 *et seq.* Parts A and B of the Medicare insurance program provide coverage for various items and services. Part A of the Medicare insurance program (42 U.S.C. §§ 1395c–1395i–5) provides insurance coverage for inpatient hospital care, home health, and hospice treatment and related services. *See* 42 U.S.C. § 1395d. Part B of the Medicare insurance program (42 U.S.C. §§ 1395j–1395w–4) provides supplemental coverage for other types of care, including medical services not covered by Part A, such as some outpatient therapeutic services. *See* 42 U.S.C. § 1395k. Vitality provides outpatient therapy services under Part B of the Medicare insurance program.

The Center for Medicare and Medicaid Services ("CMS") administers the Medicare program on behalf of the Secretary. *See* 42 U.S.C. §§ 1395h, 1395u. The CMS contracts with private insurance companies known as "fiscal intermediaries" or "carriers" to process Part A and Part B claims. Vitality's fiscal intermediary for the relevant fiscal year of 1999 was Mutual of Omaha Insurance Company ("Omaha").

In order for providers of Medicare services to receive reimbursement of their claims, providers (*i.e.*, Vitality), are required to submit to their designated fiscal intermediary or carrier (*i.e.*, Omaha) an annual cost report that contains their claims. *See* 42 C.F.R. §§ 405.1801(b), 413.20–413.24. These fiscal intermediaries then determine payment amounts that are due to these providers. *See* 42 C.F.R. § 413.20(b).

After reviewing these cost reports, the intermediary makes a final determination—also known as a notice of program reimbursement ("NPR")—that states the total amount the provider should be reimbursed for services it gave to Medicare beneficiaries for that fiscal year. 42 C.F.R. § 405.1803.

If a provider is dissatisfied with the intermediary's final determination, then the provider may appeal the decision to the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo(a). The Secretary has the authority to review the PRRB determination. *Id.* § 1395oo(f)(1). If the Secretary does not modify, reverse, or affirm the decision within 60 days of the PRRB's decision, then the PRRB's decision is final. 42

15, 2009. Also, the Scheduling Order does not require that the Secretary file two separate briefs. The Secretary's Opening Brief clearly also serves as an opposition to Vitality's Opening Brief as it addresses arguments raised in Vitality's Opening Brief.

C.F.R. §§ 405.1871(b), 405.1875(a). A provider may obtain judicial review within 60 days of any final decision of the PRRB or the Secretary. 42 U.S.C. § 1395oo(f)(1).

### B. Payment for Part B Medicare–Covered Services

In the Balanced Budget Act of 1997 ("BBA"), effective January 1, 1999, Congress changed the payment methodology for Part B Medicare services. Prior to the effective date of the BBA, January 1, 1999, providers of Part B services were reimbursed for the "reasonable costs" of covered services.[2] The BBA changed the payment methodology such that providers of Part B services were to be reimbursed according to a fixed physician fee schedule published once a year, and no longer on the basis of reasonable costs.[3] *See* 42 U.S.C. §§ 1395*l*(a)(8)(A)(i), 1395m(k).

Vitality and the Secretary agree that prior to the change in the payment methodology for Part B services when providers were reimbursed on the basis of "reasonable costs," providers were also reimbursed for "bad debts." Bad debts are defined as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services" and include "the costs attributable to the deductible and coinsurance amounts that remain unpaid [which] are added to the Medicare share of allowable costs." 42 C.F.R. § 413.80(b), (d).[4] Vitality and the Secre-

tary, however, differ as to whether bad debts are reimbursable for Part B services after the January 1, 1999 change in payment methodology from a reasonable costs system to a system based on the physician fee schedule.

A main component of the Secretary's argument (addressed below) as to why the bad debts are not reimbursable under a fee schedule payment methodology depends on Medicare's prohibition against cross-subsidization, or the anti-cross-subsidization principle. The anti-cross-subsidization principle holds that costs for individuals covered by the Medicare program must not be borne by uncovered individuals, and costs for uncovered individuals must not be borne by Medicare. It is derived from the definition of "reasonable costs," set forth in 42 U.S.C. § 1395x(v)(1)(A). This subsection states that the Secretary shall prescribe regulations regarding reasonable costs which shall "take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs, *the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.*"

---

**2.** Specifically, for services furnished to Medicare beneficiaries prior to January 1, 1999, Medicare reimbursed entities which furnished therapy outpatient physical therapy, outpatient occupational therapy services, and outpatient speech-language pathology services based on the lesser of: (1) the charges imposed for the services or (2) the reasonable costs of providing the services. *See* 42 U.S.C. §§ 1395k(a)(2)(C), 1395*l*(a)(8), 1395m(k)(2), 1395x(v)(1)(A).

**3.** Specifically, after January 1, 1999, the BAA required that Part B reimbursement for thera-

py services be paid at the lesser of the provider's actual charges or the physician's fee schedule established under 42 U.S.C. section 1395w–4. *See* 42 U.S.C. §§ 1395*l*(a)(8)(A), 1395m(k).

**4.** This regulation was recodified as 42 C.F.R. section 413.89 (effective January 1, 2007). However, as the controlling regulation at the time is found at 42 C.F.R. § 413.80, citations will be made to 42 C.F.R. § 413.80 (1999).

The anti-cross-subsidization principle is discussed further below.

## C.  Factual Background

In its fiscal year of 1999, Vitality was an outpatient rehabilitation facility which participated in the Medicare program, and provided outpatient therapy services, such as physical, speech, and occupational therapy services. *See* Compl. ¶¶ 5, 7. These services were subject to payment under the Medicare Part B fee schedule. *Id.* ¶ 7. Vitality's fiscal intermediary for the fiscal year of 1999 was Mutual of Omaha Insurance Company ("Omaha").

Vitality filed a cost report with Omaha for its fiscal year of 1999, which included Vitality's claim for reimbursement of bad debts for services that Vitality provided to patients that were dually eligible for Medicare and Medicaid. Compl. ¶ 24.

In a letter dated February 28, 2001, Omaha issued its initial notice of program reimbursement for Vitality's fiscal year of 1999 (AR 260–85) which denied Vitality's claim of Medicare bad debts related to deductible and coinsurance amounts arising from outpatient therapy services paid under the Medicare Part B fee schedule. *See* AR 264–65, 284. Omaha explained that it had "adjust[ed] to remove bad debts which are nonallowable after 1/1/1999 under [the] fee schedule" and would "only allow the bad debts with service dates prior to 1/1/1999." *See* AR 264.

On March 15, 2001, Vitality appealed the notice of program reimbursement to the Provider Reimbursement Review Board ("PRRB"). *See* AR 258–59. The PRRB, in a 3–2 decision issued on March 17, 2008, reversed Omaha's adjustment and found the bad debts to be reimbursable. *See* AR 29–34. On May 15, 2008, the CMS Deputy Administrator reversed the PRRB's decision and upheld Omaha's disallowance of the bad debts at issue. *See* AR 1–17. The Deputy Administrator is the final decision of the Secretary in this matter. 42 U.S.C. § 1395oo(f). Vitality timely appealed the Administrator's decision on July 14, 2008 with this Court.

## III.  Analysis

### A.  Standard of Review

■ The Court's jurisdiction in this action is exclusively based on 42 U.S.C. section 1395oo(f)(1) which provides for judicial review of final Medicare provider reimbursement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Under the APA, courts shall hold unlawful and set aside an agency's action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, not in accordance of the law, or unsupported by substantial evidence on the record taken as a whole." *Lodi Community Hospital v. Shalala*, 94 F.3d 1251, 1252–53 (9th Cir.1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Also, the arbitrary or capricious standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 499 F.3d 1108, 1115 (9th Cir.2007) (internal citations omitted).

■ When the issue is whether an agency has properly interpreted and applied its own regulation, the reviewing court is required to give the agency's interpretation "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). An "agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.

In other words, [courts] must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* at 512, 114 S.Ct. 2381 (internal citations and quotations omitted). *See also Blum v. Bacon,* 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) ("We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference."). However, when the language of the regulation is "not ambiguous," and the regulation is plain on its face, such deference is not required. *See Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

### B. Whether Regulations Are Plain on Their Face

■ First, the Court finds that, contrary to Vitality's assertions, the language of the regulations relevant to whether the bad debts at issue are reimbursable under the revised payment methodology are ambiguous, and are not plain on their face. Accordingly, the Court gives the Secretary's interpretation of its regulations substantial deference.

Vitality points to the language in 42 C.F.R. section 413.80 and states that it expressly and unambiguously requires Vitality's bad debts to be reimbursed. Vitality specifically cites to subsection (a) of 42 C.F.R. section 413.80 which states: "Principle. Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable cost; however, except for anesthetists' services described under paragraph (h) of this section, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program." 42 C.F.R. § 413.80(a) (1999).

■ However, as the Secretary counters, 42 C.F.R. § 413.80 *et. seq.* do not specifically and unambiguously address whether bad debts arising from an entity's provision of Part B services paid under a fee schedule are reimbursable. *See Abington Crest Nursing and Rehab. Ctr. v. Leavitt,* 541 F.Supp.2d 99, 105–06 (D.D.C. 2008) (making a similar finding that the bad debt regulations, 42 C.F.R. § 413.80 *et seq.* do not specifically address whether bad debts arising from Part B services provided by skilled nursing facilities are reimbursable).

Also, as the Court must interpret the regulation "as a whole, in light of the overall statutory and regulatory scheme, and not ... give force to one phrase in isolation" in order to discern the meaning of the regulatory language, the Court must look beyond subsection (a) of 42 C.F.R. section 413.80 to discern the meaning of the bad debt regulations. *Norfolk Energy, Inc. v. Hodel,* 898 F.2d 1435, 1442 (9th Cir.1990) (internal citation omitted).

Other subsections of 42 C.F.R. section 413.80 make references to "costs," which at the very least, makes it ambiguous whether a cost-based reimbursement system for services is a prerequisite to reimburse for bad debts. For example, 42 C.F.R. section 413.80(d), entitled "requirements for Medicare," refers to the statutory prohibition on cross-subsidization (addressed in the statute's definition of reasonable costs in 42 U.S.C. § 1395x(v)(1)(A)), and makes numerous references to "costs." *See also* Secretary's Opening Brief at 17:17–18:4.

■ Also, section 413.80 is included in Part 413 of Title 42 of the Code of Federal Regulations, which is entitled "Principles of Reasonable ***Cost*** Reimbursement ...," and is also within Subpart F, entitled "Specific Categories of ***Costs.***" (emphasis added). The heading of a regulation section is relevant to the meaning of the

regulation. *See Gorman v. Nat'l Transp. Safety Bd.*, 558 F.3d 580, 588 n. 5 (D.C.Cir. 2009) (stating that regulation headings "are of use ... when they shed light on some ambiguous word or phrase.'") (internal citations omitted); *Phelps Dodge Corp. v. Fed. Mine Safety and Health Review Comm'n*, 681 F.2d 1189 (9th Cir.1982) (referring to regulation headings in analyzing regulations); *cf. Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, — U.S. —, 128 S.Ct. 2326, 2336, 171 L.Ed.2d 203 (2008) (finding that while "a subchapter heading cannot substitute for the operative text of the statute," that nevertheless "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute.") (internal citations and quotations omitted). These section headings, which contain the term "costs," create some ambiguity as to whether a cost-based reimbursement system for services is a prerequisite to also reimburse for bad debts.

The language of 42 C.F.R. section 413.80 does not support Vitality's position that the regulation expressly and unambiguously requires that bad debts must be reimbursed, even when Part B services are paid under a fee schedule, and not on the basis of reasonable costs. The Court must give substantial deference to the Secretary's interpretation of its regulations under *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. 2381.

### C. Whether Secretary's Interpretation is Reasonable

■ The Court finds that a "reasonable basis" exists for the Secretary's decision denying reimbursement of bad debts arising from Part B services provided by Vitality during its fiscal year of 1999, as Vitality was reimbursed on the basis of the Part B Medicare fee schedule, and not on the basis of reasonable costs. *See Ranchers Cattlemen*, 499 F.3d at 1115 (finding that courts should "presum[e] the agency action to be valid and affirm[ ] the agency action if a reasonable basis exists for its decision.").

The Secretary and Vitality agree that prior to the enactment of the Balanced Budget Act of 1997 ("BBA") (effective January 1, 1999), Vitality was reimbursed for Part B services on a reasonable cost basis. However, once the BAA took effect, Vitality was reimbursed for Part B services on a fixed Medicare B fee schedule. *See* Vitality Opening Brief at 4:10–20; 5:24–11; Secretary Opening Brief at 14:4–8. Vitality asserts that regardless of the change in payment methodology effective January 1, 1999, it should still be reimbursed for its bad debts. The Secretary disagrees.

The Secretary's explanation that the bad debt provisions were originally implemented to effectuate Congress' reasonable cost anti-cross-subsidization provision and are therefore not controlling under a fee schedule payment methodology, provides a reasonable basis to support the Secretary's decision denying reimbursement of Vitality's bad debts. *See* Secretary's Opening Brief at 14:2–15:18; AR 11.

The Secretary originally implemented the bad debt regulations, 42 C.F.R. section 413.80 *et seq.* in 1966 to effectuate Congress' prohibition on cross-subsidization, set forth in the statutory definition of "reasonable costs." The Medicare statute directs the Secretary to set forth regulations "establishing the method or methods to be used" for determining "reasonable costs." 42 U.S.C. § 1395x(v)(1)(A). The Medicare statute also directs the Secretary, in prescribing regulations regarding reasonable costs, to effectuate the anti-cross-subsidization provision. *See* 42 U.S.C. § 1395x(v)(1)(A) ("Such regulations shall ... take into account both direct and indirect costs of providers of services ... in order that, under the methods of determining costs,

*the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs ....* ") (emphasis added).

To implement Congress' anti-cross subsidization policy, the Secretary prescribed the bad debt reimbursement provisions in 42 C.F.R. section 413.80 *et seq.* that establish that Medicare pay the bad debts for services paid under a reasonable cost system. *See* 42 C.F.R. § 413.803(d) ("To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs."); *see also* Medicare Program; Provider Bad Debt Payment, 68 Fed.Reg. 6682, 6683 (Feb. 10, 2003) ("The concept of Medicare bad debt payments applies only to services reimbursed on the basis of reasonable cost. Medicare has never made payments to account for bad debts for services paid under a fee schedule or reasonable charge methodology, such as services of physicians or suppliers.").

As the bad debt provisions were originally implemented to address the anti-cross-subsidization principle which is found in the definition of "reasonable costs," the Secretary's assertion that the bad debt provisions are no longer applicable to the claims at issue when reimbursement was made under a fee schedule (and not according to reasonable costs) is reasonable.

Another reasonable basis that exists for the Secretary's decision denying reimbursement of Vitality's bad debts is that it is improper to separately reimburse bad debts for services paid on a fee schedule because a fee schedule includes a built-in profit margin that already accounts for all costs, including bad debts. Under a fee schedule, Medicare makes payment for services based on a predetermined rate which includes a margin for profit and which reflects the price of doing business. It is not related to the actual cost incurred by the provider, and therefore does not involve costs, or likewise, unrecovered costs of bad debts. *See* 42 U.S.C. 1395w–4; *Abington,* 541 F.Supp.2d at 106–07. This fee schedule based system is different from a reasonable cost system where Medicare pays for the cost actually incurred by the provider, including unrecovered costs attributable to uncollectible deductibles and coinsurance. *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A), Medicare Program; Revisions to Payment Policies, 71 Fed.Reg. 69,624, 69,712 (Dec. 1, 2006) ("Under a fee schedule or reasonable charge methodology, Medicare does not share proportionately in an entity's incurred costs but rather makes payment for a specific service. The payment is not related to the cost of a service and thus, does not embody the concept of unrecovered costs due to uncollected amounts of deductibles and coinsurance."); 68 Fed. Reg. at 6683 ("Under a fee schedule or reasonable charge methodology, Medicare reimbursement is not based on costs and, therefore, the concept of unrecovered costs is not relevant.").

Vitality's argument that the Secretary is overstating the scope of the prohibition on cross-subsidization, and misstating that bad debt is an exclusive feature of the reasonable cost system is unsupported. Vitality states that bad debts are not just available for services paid on a reasonable cost system, but also available to services paid on a prospective payment system ("PPS"). *See* Vitality Opposition and Reply at 7:18–9:1; Secretary Reply at 6:24–8:4. However, the fact that bad debts are also available for services paid on a prospective payment system does not support

the Court finding that the Secretary's interpretation is "arbitrary, capricious, an abuse of discretion, not in accordance of the law, or unsupported by substantial evidence on the record taken as a whole." First, Vitality's argument is not relevant because the services at issue here were reimbursed based on a fee schedule, and not under a prospective payment system. *See* Vitality Opening Brief at 4:10–20; 5:24–11. Secondly, the Secretary acknowledged that "[p]ayment of bad debt applies only to services reimbursed on the basis of reasonable costs *or to services paid under one of Medicare's prospective payment systems [PPS] that have a basis in reasonable costs that do not reflect Medicare payment of bad debts during a specified provider base period.*" *See* Secretary Opening Brief at 7 (citing 71 Fed.Reg. at 69,712) (emphasis added), at 24. Thirdly, as the *Abington* court found, "the payment rates under a prospective payment system are based on costs, not charges." *See Abington*, 541 F.Supp.2d at 107 (citing 42 C.F.R. § 413.337(a)). Medicare continues to pay for bad debts arising under PPS because the cost-based payment rates do not include bad debts. *See Abington*, 541 F.Supp.2d at 107 (citing 68 Fed.Reg. at 6,683). The regulations also explicitly state that bad debts would be reimbursed for services provided under the PPS, while there is no similar rule for Part B services provided under the physicians fee schedule. *See Abington*, 541 F.Supp.2d at 108 (citing 42 C.F.R. § 412.115).

The Court finds—as the *Abington* court did—that based on these reasons, the Secretary's decision that the bad debt provisions do not apply to services for which Medicare payment is based on a fee schedule methodology "is a reasonable reading of the applicable law and regulations." *See Abington*, 541 F.Supp.2d at 107. As Vitality's other arguments do not warrant a different finding, the Court upholds the Secretary's determination that Vitality's

bad debts from the fiscal year of 1999 are not reimbursable.

### D. Congressional Silence

Vitality asserts that bad debts are still reimbursable even though Congress changed the payment methodology for its Part B outpatient therapy services to a fee schedule payment system. First, Vitality asserts that Congress did not intend to limit the right of therapy providers to obtain reimbursement for bad debts. Secondly, Vitality asserts that the Secretary and the CMS acknowledged that under 42 C.F.R. section 413.80, bad debts were still reimbursable for Part B services paid under a fee schedule—otherwise, they would not have had to publish their Notice of Proposed Rulemaking in 2003. Thirdly, Vitality states that training materials show that bad debts are reimbursable. Lastly, Vitality points to a stipulation that it entered into with its fiscal intermediary, Omaha, that guaranteed the reimbursement of its bad debts for the 1999 fiscal year. These arguments, however, do not have sufficient merit to reverse the Secretary's May 15, 2008 decision.

First, Vitality argues that when Congress enacted the BBA and changed the payment methodology for Part B therapy services, Congress did not limit the right of therapy service providers to obtain reimbursement for bad debts, while it did for other types of Medicare providers such as hospitals, anesthetists, and ESRD services. Vitality asserts that this shows Congress' intent that other service providers, like Vitality, continue to obtain reimbursement for bad debts. Vitality Opening Brief at 10:19–11:7. This argument, however, lacks sufficient merit as congressional silence by itself, does not control statutory interpretation. *See U.S. v. Wells*, 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) ("we have frequently

cautioned that [i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law") (internal citations and quotations omitted); *Brown v. Gardner*, 513 U.S. 115, 121, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ("congressional silence lacks persuasive significance.") (internal citations and quotations omitted).

Furthermore, as set forth by the *Abington* court, Congress did not need to specifically address whether providers of Part B therapy services could still be reimbursed for bad debts because as the bad debt reimbursement policy is "an exclusive feature of the reasonable cost system," this "eschews the need to address this specific issue through legislation." *Abington*, 541 F.Supp.2d at 107 & n. 9.

Furthermore, the Secretary's analysis of why there is a specific regulation (42 C.F.R. section 413.80(i)) that addresses non-reimbursement of bad debts for nurse anesthetist services which are paid under a fee schedule is also reasonable. The Secretary states that in 1986, Congress mandated the payment of nurse anesthetist services under a fee schedule, and also at the same time, prohibited reimbursement of bad debts associated with such services. *See* Omnibus Budget Reconciliation Act (OBRA) of 1986, Pub.L. No. 99–509, § 9320, 100 Stat. 1874, 2013 (1986); *see also* 42 U.S.C. §§ 1395*l*(*l*)(1)(A), 1395*l*(*l*)(5)(B). Congress' act prohibiting reimbursement of bad debts for nurse anesthetist services is consistent with the Secretary's policy on bad debt—both prohibit reimbursement of bad debts arising from services paid on a fee schedule. Also, the nurse anesthetist legislation was passed in 1986, eleven years before the BBA of 1997, and three years before OBRA 1989 which mandated the physician fee schedule—thus making it reasonable that there was specific legislation for nurse

anesthetist services because they were paid on a unique payment system, a fee schedule only for anesthetist services.

### E. 2003 Proposed Rule

■ Secondly, Vitality asserts that the Secretary and the CMS published a Notice of Proposed Rulemaking in 2003 that made clear that bad debts were not allowable for entities paid under reasonable-charge or fee schedule methodologies. *See* 68 Fed. Reg. 6682, 6683–87 (Feb. 10, 2003). Vitality asserts that this proposed rule change shows that 42 C.F.R. section 413.80 required reimbursement of bad debts even under the changed payment system, otherwise the proposed rule would have been unnecessary. *See* Vitality Opening Brief at 11:7–12:2. This argument also lacks support as the Secretary explicitly stated in the 2003 proposed rule that it was not making a change in policy, but rather confirming its bad debt policy.

The Secretary expressly stated in the 2003 proposed rule that this rule is a "confirmation of bad debt policy for services paid under a charge-based methodology or fee schedule." *See* AR 12–13; 68 Fed. Reg. at 6685 (observing that "[t]his proposed rule would amend language in the existing bad debt regulations to clarify that bad debts are not recognized or reimbursed for any services paid under a reasonable charge-based methodology or a fee schedule" and that "[t]his clarification is not a change in policy.") (emphasis added); *id.* at 6683 ("Medicare has never made payments to account for bad debts for services paid under a fee schedule or reasonable charge methodology."). The 2003 proposed rule also discussed that the bad debt policy originated from the "anti-cross subsidization principle." *See* AR 12–13; 68 Fed.Reg. at 6683. The Secretary's assertion that the 2003 proposed rule confirmed or clarified its bad debt policy, and was not a "change in policy" is reasonable.

## F. The Training Materials

Next, Vitality states that training materials that CMS provided its intermediaries—entitled Transmittal 6, BBRA Training, shows that the Secretary and CMS acknowledged that it was Congress' intent that bad debts be reimbursed under a prospective payment system ("PPS"). *See* Vitality Opening Brief at 12:23–13:19; AR 287–89. However, as mentioned above, Vitality is reimbursed according to a fee schedule, and not PPS. Also, as explained above, bad debts are paid under PPS systems that have a basis in reasonable *costs*. Furthermore, the training materials do not show the Secretary and CMS interpreting congressional intent, as they explicitly state that Congress did not show its intent. Lastly, the training material refers to a change in the Medicaid statute, not the Medicare statute.

Transmittal 6 includes an excerpt from Program Memorandum A–98–18, which corrects a previous misinterpretation by the CMS of Congressional intent issued in a Program Memorandum, Transmittal No. A–97–19. Transmittal 6 states, "Please read the following excerpt from Program Memorandum A–98–18." The excerpt from Program Memorandum A98–18 states:

> Upon further examination of the legislative history, we concluded that Congress had not intended to address this issue [bad debt treatment for Qualified Medicare Beneficiaries—"QMB"] and that the language in § 4714(a) of the BBA did not preclude the Medicare program from recognizing the unpaid QMBs' cost-sharing as Medicare bad debt. Therefore ... in States were Medicaid does not fully pay for QMBs' cost sharing, providers may claim the difference as a bad debt for purposes of Medicare payment.

This excerpt from Transmittal A–98–18, however, does not discuss the applicability of bad debt reimbursement for claims paid under a fee schedule, or other charge-based system. *See* AR 287–89; Secretary Reply at 8:13–18.

Also, while Vitality asserts that Transmittal 6 (specifically Transmittal A–98–18) shows that the Secretary and CMS acknowledged that it was Congress' intent that bad debts be reimbursed under PPS, Transmittal A–98–18 does not actually state what Congress' intent regarding bad debt reimbursement is, but rather states that "[u]pon further examination of the legislative history, it was concluded that Congress *had not intended to address this issue.*" (emphasis added).

Finally, as the Secretary asserts, the language in Transmittal No. A–98–18 relates to changes in the Medicaid Act, and not the Medicare Act. Transmittal No. A–98–18 explains changes made to a subsection of the Medicaid Act (42 U.S.C. § 1396a(n)(3)(A) by section 4714 of the BBA). *See* Secretary Opening Brief at 23:7–11, n. 20 (citing PL 105–33, August 5, 1997, 11 Stat 251, 509–10 (Aug. 5, 1997)).

While the Secretary also asserts that Transmittal A–98–18 was only sent to Part A (and not Part B) fiscal intermediaries, the Secretary does not provide enough evidentiary support for the Court to conclude that Transmittal A–98–18 was only sent to Part A fiscal intermediaries. *See* Reply at 8:10–23. For example, the Court cannot verify that the names at the end of the transmittal (Katie Walker or Tom Talbott) refer to CMS employees who only deal with Part A. The Secretary also does not provide sufficient evidence that shows that since the Transmittal A–98–18 starts with the letter A, it only refers to issues pertaining to Part A of Medicare.

## G. Stipulation Between Vitality and Omaha

Lastly, Vitality points to a stipulation between Vitality and its intermediary,

Omaha, that "under the present regulations as an outpatient therapy provider, Medicare will still reimburse [Vitality] 100% of all co-insurance which becomes bad debt. . . ." *See* Vitality Opening Brief at 13–14; AR 191–92.

However, as the Secretary asserts, the Secretary is not bound by a stipulation between Vitality and its intermediary, Omaha. *See Heckler v. Cmty. Servs.*, 467 U.S. 51, 64, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (finding that Medicare provider could not rely on fiscal intermediary's interpretation of applicable regulations because the fiscal intermediary acted only as a conduit, and could not resolve policy questions); *Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d 1065, 1074 (9th Cir. 2007) ("[T]he Secretary is not necessarily bound by stipulations entered into at the PRRB hearing by an intermediary.").

In sum, Vitality's arguments that the Court should reverse the Secretary's May 15, 2008 decision lack sufficient merit. The Secretary's decision is upheld pursuant to grounds set forth in the Secretary's brief, as set forth herein.